UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CIV-21603-RAR

**THE TRAVELERS INDEMNITY
COMPANY OF AMERICA**,

    Plaintiff,

v.

**DEAUVILLE HOTEL PROPERTY LLC**,

    Defendant.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**THIS CAUSE** comes before the Court upon Defendant's Motion for Partial Summary Judgment [ECF No. 64] ("Defendant's Motion") and Plaintiff's Motion for Summary Judgment [ECF No. 67] ("Plaintiff's Motion"). The Court having reviewed the parties' written submissions, the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion is **DENIED** and Plaintiff's Motion is **GRANTED IN PART AND DENIED IN PART** as set forth herein.

**BACKGROUND**

At the outset, the Court identifies the undisputed facts underlying the parties' cross-motions for summary judgment. This is an insurance coverage dispute arising from an electrical arcing incident that occurred on July 25, 2017 at the Defendant Deauville Hotel ("Deauville" or "Hotel") in Miami Beach, Florida. *See* Pl. Statement of Material Facts [ECF No. 68] ("Pl. SOMF") ¶ 1. The parties seek declaratory judgment as to Plaintiff Travelers Indemnity Company of America's ("Travelers") first-party coverage obligations under a boiler and machinery insurance policy it

issued to Deauville, which was effective February 2, 2017 through October 3, 2017 ("Policy").[1] *See generally* Compl. [ECF No. 1] and Countercl. [ECF No. 7]; *see also* Pl. SOMF ¶¶ 1, 3.

The July 25, 2017 electrical arcing incident caused substantial damage to the Hotel and resulted in evacuation of the Hotel's guests, disconnection of power, and closure of the Hotel. *See* Def. Statement of Material Facts [ECF No. 65] ("Def. SOMF") ¶ 8. Deauville engaged a contractor, Property Services Warranty, Inc. ("PSW"), to repair electrical equipment damaged by the incident, including replacing a damaged bus duct. *See* Pl. SOMF ¶ 6. Deauville submitted a claim to Travelers for the repair and replacement of the bus duct, additional damages to the property, spoilage, mold, and business income losses. *See* Compl. ¶ 14; Ans. ¶ 14. Travelers does not dispute that Deauville is entitled to coverage under the Policy for damage caused by the electrical arcing incident and has made approximately $3.5 million in payments towards the loss. Pl. SOMF ¶ 16; Def. SOMF ¶ 10; Pl. Resp. to Def. SOMF [ECF No. 76] ¶ 10.

This leads us to the issues in contention. While processing Deauville's electrical permit application for the replacement bus duct, the City of Miami Beach ("City") informed Deauville that it was also required to build an encasement wall to shield the bus duct. *See* Pl. Mot., Ex. D and E [ECF Nos. 67-4 and 67-5]. On December 12, 2017, Deauville applied for a permit to build that wall and the City issued the permit on April 12, 2018. *See id*. Florida Power and Light ("FPL") also notified Deauville that before it could have permanent power restored, Deauville would have to rebuild its transformer vault. *See id.*, Ex. D and F [ECF Nos. 67-4 and 67-6].

Travelers maintains that these additional requirements imposed by the City and FPL are unrelated to damage resulting from the electrical arcing incident—and that Deauville is not entitled to coverage for the costs of implementing those requirements. *See* Compl. ¶ 38; Pl. Mot. at 4.

---

[1] The Policy is attached as Exhibit 1 to the Complaint. *See* [ECF No. 1-1].

Deauville, on the other hand, insists that the need to reconstruct the transformer vault stems from damage caused by the electrical arcing incident, and Travelers is therefore required to cover the costs of reconstructing the vault, as well as the Hotel's business income losses through the date when the Hotel's electrical system is restored to its pre-loss condition. *See* Countercl. ¶¶ 31, 62.

On May 29, 2020, the parties filed cross-motions for summary judgment. Travelers seeks summary judgment on all five counts asserted in its Complaint, whereas Deauville seeks summary judgment on Travelers' Eighth Affirmative Defense and partial summary judgment on its Counterclaim. *See generally* Def. Mot. and Pl. Mot. The cross-motions for summary judgment center on three issues: (1) whether Deauville is entitled to coverage for the costs of building the encasement wall and reconstructing its transformer vault; (2) whether Travelers appropriately determined the "Period of Restoration" for business interruption coverage; and (3) the proper interpretation and application of the Policy's coinsurance percentage for purposes of determining business interruption coverage.[2] *See id.*

## **LEGAL STANDARD**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th

---

[2] Travelers' Motion also seeks summary judgment on Counts II and III of its Complaint, which address whether Travelers has paid all sums it owes Deauville for spoilage and mold. *See* Pl. Mot. at 20-21. However, in its Reply, Travelers withdraws its motion for summary judgment as to those counts and indicates that it intends to voluntarily dismiss them because the parties agree that there is no actual controversy concerning coverage for spoilage and mold. *See* Pl. Reply [ECF No. 84] at 15.

Cir. 1997) (citation omitted), and "must resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990) (citation omitted).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (alterations and internal quotation marks omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the moving party has shouldered its initial burden, the burden shifts to the non-moving party to "'set forth specific facts showing that there is a genuine issue for trial,' not just to 'rest upon the mere allegations or denials of the adverse party's pleading.'" *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (quoting *Resolution Trust Corp. v. Camp*, 965 F.2d 25, 29 (5th Cir. 1992)). "The nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law . . . ." *Tidwell v. Carter Prod.*, 135 F.3d 1422, 1425 (11th Cir. 1998).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotations and citations omitted).  Thus, a court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

# ANALYSIS

### a. Coverage for Construction of Encasement Wall and Transformer Vault (Counts I and IV of Travelers' Complaint)

Travelers argues that the Court should grant summary judgment on Counts I and IV of its Complaint because undisputed facts establish that Deauville is not entitled to any additional coverage for the costs of building the encasement wall (as required by the City) and reconstructing the transformer vault (as required by FPL). *See* Pl. Mot. at 7-13. In Counts I and IV of the Complaint, Travelers seeks a declaratory judgment that it has paid Deauville all sums due under Sections A.1. and A.2.m. of the Policy, respectively. *See* Compl. ¶¶ 39, 67. Section A.1 dictates coverage for property damage, providing that Travelers "will pay for direct damage caused by a Covered Cause of Loss to Covered Property . . . ." *See* Policy at 17 (internal quotation marks omitted). Section A.2.m. is the Policy's Ordinance or Law Coverage Extension, which entitles Deauville to recover—under certain specified circumstances—up to $250,000 in costs expended to comply with a law or ordinance. *See id.* at 22. The Court will address Travelers' motion for summary judgment on each of these two counts in turn.

#### *i. Property Damage Coverage (Count I of Travelers' Complaint)*

The Court agrees with Deauville that fact issues preclude summary judgment on Count I of the Complaint, where Travelers seeks a declaration that it has paid all sums due to Deauville under Section A.1 of the Policy. As an initial matter, it is unclear from Travelers' Complaint and Motion exactly what additional payments Deauville is seeking and whether those sums are limited to the costs of implementing the requirements imposed by FPL and the City. In fact, Deauville points out that Travelers only addresses "two of the multiple items of property damage Travelers has refused to pay, namely the transformer vault and encasement wall" and does nothing to explain its failure to pay the remaining $115,895.86 incurred by Deauville to repair property damage

caused by the electrical arcing event, which Deauville itemizes in its Response. *See* Def. Resp. at 4. The remaining $115,895.86 includes, for example, amounts paid for engineering services to address repairs related to the electrical arcing incident in the fall of 2017. *See id.*

Notably, in its Reply, Travelers still fails to meaningfully address these additional items. *See generally* Pl. Reply [ECF No. 84]. It merely states in a footnote, without elaboration, that "most, if not all, of the engineering costs claimed in Defendant's Response would be addressed by a ruling on the coverage issue presented by Travelers' motion." *See id.* at 2, n.1. The Court cannot declare that Travelers has paid Deauville all sums owed for direct property damage from the electrical arcing incident when Travelers fails to explain why the costs itemized in Deauville's Response are not covered by the Policy. Therefore, even if the Court were to conclude that Travelers is not required to cover the costs of repairing the transformer vault and encasement wall, Travelers has provided insufficient information for the Court to make a definitive finding that Travelers has paid *all* sums due to Deauville under Section A.1 of the Policy for repairs relating to the electrical arcing incident.

Further, genuine issues of material fact exist as to whether the electrical arcing event caused direct damage to the transformer vault. Travelers contends that because the need to reconstruct the transformer vault was not caused by the electrical arcing incident, the only possible coverage for the vault reconstruction is the Ordinance and Law Extension—and that Travelers has already paid Deauville the $250,000 maximum under that section of the Policy. *See* Pl. Mot. at 11; Compl. ¶ 66. To support its position that the vault reconstruction was unrelated to the electrical arcing incident, Travelers cites to a November 2, 2017 email from FPL notifying Deauville that "[f]rom an increase in loading stemming from new equipment installations over the years[,] the total loading on the vault now requires an increase in transformer size and an update to the throw over

inside." *See* Pl. Mot. at 8, Ex. F [ECF No. 67-6]. Travelers insists that there are no communications or testimony from FPL indicating that the need for the vault expansion was related to the arcing incident. *See id.* at 8.

However, Deauville has presented more than a "mere scintilla" of evidence to support a jury question regarding the reasons for needing to reconstruct the transformer vault. Deauville cites an analysis by its engineering expert stating that the electrical arcing event caused damage to the transformer vault. *See* Def. Resp., Ex. E, Aff. of James Christopher Raeburn [ECF No. 77-5]. Deauville also cites to testimony from FPL's Corporate Representative, Joel Garcia, describing damage to insulation on FPL's secondary neutral conductor in the vault room, melted insulation on FPL jumper cables inside the vault, and damage to the concrete ceiling within the vault. *See* Def. Resp. at 6. Although Mr. Garcia does not identify the electrical arcing event as the cause of that damage, he acknowledges that the damage is not referenced in pre-loss vault inspection logs from 2013, 2014, or January 15, 2017. *See id.* Mr. Garcia further testified that but for the electrical arcing event, FPL would not have instructed Deauville to reconstruct its vault. *See id.* at 7. Finally, Deauville cites a portion of Mr. Garcia's deposition where he is shown a letter from the City indicating that the requirement to reconstruct the vault was "not due to Florida Building Code or local ordinances." *See id.* at 8. Considering the conflicting evidence presented by the parties and the highly fact-specific and technical nature of determining whether the arcing incident damaged the vault, the Court finds that summary judgment on this issue is not warranted.[3]

---

[3] The Court notes that the parties' briefs focus mainly on the transformer vault and do very little to address their dispute over coverage for the encasement wall. Neither Travelers' Motion nor Deauville's Response specify which portion of the Policy Deauville is claiming provides coverage for the construction of the encasement wall. In its Response, Deauville argues that the construction of the encasement wall was not required by any law, ordinance, or rule—and that coverage for it is therefore not precluded or limited by the Policy's Law and Ordinance provisions. *See* Def. Resp. at 10-11. However, Deauville offers no explanation for why construction of the encasement wall would otherwise be covered under the Policy if it did not result from a law, ordinance, or ruling. Given the parties' wholly underdeveloped briefing on this

Accordingly, Travelers' motion for summary judgment on Count I is **DENIED**.

### ii. *Law and Ordinance Extension (Count IV of Travelers' Complaint)*

The Court now turns to whether Travelers is entitled to summary judgment on Count IV of its Complaint, which seeks a declaration that Travelers has paid all sums due under the Policy's Ordinance or Law Coverage Extension. *See* Compl. ¶ 67. Travelers asserts that when Deauville notified it of "the actions of the City of Miami Beach and FPL regarding additional requirements . . . Travelers investigated the matter and paid the full amount of the limit applicable to this coverage extension"—*i.e.*, $250,000. Pl. Mot. at 11; *see also id.*, Ex. H, Letter from Mike Dotson dated July 23, 2018 [ECF No. 67-8].

Deauville maintains that Travelers improperly classified expenses for the vault reconstruction and encasement wall, among other items, as Law and Ordinance damages, "but paid nothing towards them." Def. Resp. at 9. Deauville states that instead, "Travelers paid its $250,000 Law and Ordinance policy limits towards Deauville's business interruption losses." *Id.* However, the Ordinance or Law Coverage Extension states that "the most [Travelers] will pay under this Coverage Extension for the sum of all covered expenses, *including loss covered under any applicable Business Income or Extra Expense coverage*" is the $250,000 Law and Ordinance limit. Policy at 23, Section A.2.m.(5) (emphasis added). Therefore, the fact Travelers paid $250,000 under the Ordinance or Law Coverage Extension to cover business interruption losses does not preclude summary judgment on Count IV.

The key question is whether summary judgment on Count IV is appropriate even though, as discussed above, fact issues prevent a finding at this stage that Deauville's reconstruction of the

---

issue—and the fact that there are separate grounds for denial of summary judgment on Count I—the Court will not analyze the availability of coverage for construction of the encasement wall under Section A.1 of the Policy.

transformer vault was due to a law, ordinance, regulation, or ruling—and not damage caused by the electrical arcing incident. The Court understands Count IV to be seeking only a declaration that Travelers does not owe more *under Section A.2.m* than the $250,000 it has already paid. Regardless of whether Travelers appropriately classified the costs of the vault reconstruction and wall encasement as Law and Ordinance expenses, Travelers would not owe more *under Section A.2.m.* of the Policy than the $250,000 limit for that section, which it has already paid.

Accordingly, Travelers' motion for summary judgment on Count IV is **GRANTED**.

### b. Business Interruption Coverage (Count V of Travelers' Complaint; Deauville's Motion for Partial Summary Judgment)

Both Deauville and Travelers seek summary judgment with respect to the proper interpretation of the Policy's business interruption coverage provisions. The Policy's Business Income Coverage Extension states, in pertinent part, as follows:

> (1) We will pay:
>
> (a) Your actual loss of "Business Income" from a total or partial interruption of business during the "Period of Restoration"; and
>
> (b) The additional necessary expenses you incur during the "Period of Restoration," over and above the expenses that you normally would have incurred, to reduce or avert the amount of loss under this Coverage Extension. We will pay for such expenses only to the extent that they do not exceed the amount of loss that otherwise would have been payable under this Coverage Extension.

*See* Policy at 17, Section A.2.a.

Under the Policy, the Period of Restoration begins at the time of the "Breakdown" (here, the electrical arcing incident) and ends on the earlier of: (a) thirty days "after the date when the property at the Covered Premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality," or (b) "[t]he date when business is resumed at a new permanent location."

*Id.* at 38, Section F.19. The Period of Restoration does not include "any increased period required due to the enforcement of any ordinance or law that . . . [r]egulates the construction, use or repair, or requires the tearing down of any property . . . ." *Id.*

The Policy's business interruption coverage is also subject to a Business Income Coinsurance provision. *Id.* at 31, Section E.1.m. ("Coinsurance Provision"). The Coinsurance Provision essentially states that to the extent Deauville underinsured itself—as determined by a formula set forth in the provision—Travelers' obligation to pay Deauville's business income losses is reduced. *Id.*

The parties' dispute with respect to the Policy's business interruption coverage provisions centers on two issues: (i) whether Travelers appropriately determined the Period of Restoration; and (ii) whether Travelers properly calculated the coinsurance percentage.

### i. *Period of Restoration (Count V of Travelers' Complaint)*

Travelers argues that it is entitled to summary judgment on Count V of its Complaint, which seeks a declaration that Travelers paid all sums due to Deauville under the Policy for business income losses related to the July 25, 2017 electric arcing event. *See* Compl. ¶ 86; Pl. Mot. at 13-20. Travelers asserts that all repair work from the electrical arcing event was completed by December 20, 2017—and that Travelers therefore properly determined that the Period of Restoration ended 30 days after that (*i.e.*, on January 19, 2018). *Id.* at 14. Travelers thus maintains that it is not required to pay Deauville for business income losses beyond that date. *Id.* Specifically, Travelers asks the Court to reject Deauville's position "that the Period of Restoration should be calculated based on 1) the date on which the permits [Deauville was] required to pull from the City of Miami Beach were 'closed,' which in this case was August 1, 2018; or 2) the date when permanent power is restored to the hotel, which in this case is some date in the future." *Id.*

To interpret the Policy's definition of "Period of Restoration," the Court applies Florida law on the interpretation of insurance contracts. *See Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1186 (11th Cir. 2002); *Century Sur. Co. v. Kid's Club Preschool, Inc.*, No. 10-CV-539, 2011 WL 13118599, at *1 (N.D. Fla. May 28, 2011). "In construing an insurance contract, it is well-settled in Florida that 'a court must first examine the natural and plain meaning of a policy's language.'" *Anderson v. Auto-Owners Ins. Co.*, 172 F.3d 767, 769 (11th Cir. 1999) (quoting *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1548–49 (11th Cir. 1996)). "Where the existence or nonexistence of coverage is clear from the unambiguous terms of the policy, the court must give those terms the effect their plain meaning dictates." *Id.* "An unambiguous policy provision is enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *S.-Owners Ins. Co. v. Easdon Rhodes & Assocs. LLC*, 872 F.3d 1161, 1164 (11th Cir. 2017) (internal quotation and citation omitted).

In contrast, where "policy language is susceptible to multiple, reasonable interpretations," the policy is "considered ambiguous and must be interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." *Id.* (internal quotation and citation omitted). The policy "must actually be ambiguous" to allow for such a construction. *Id.* (quoting *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)). "Courts are not authorized 'to put a strained and unnatural construction on the terms of a policy in order to create an uncertainty or ambiguity.'" *Id.* (quoting *Jefferson Ins. Co. of N.Y. v. Sea World of Fla., Inc.*, 586 So. 2d 95, 97 (Fla. 5th DCA 1991)). Indeed, "[t]he mere fact that an insurance provision is 'complex' or 'requires analysis' does not make it ambiguous." *Id.* (quoting *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003)).

Applying these principles here, the Court finds that the Policy's definition of "Period of Restoration" unambiguously excludes the time required to obtain permits from the City. As set forth above, the Policy states that the Period of Restoration begins at the time of the Breakdown and ends thirty days after the date "when the property at the Covered Premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality." Policy at 38, Section F.19. The Policy expressly excludes from the Period of Restoration "any increased period required due to the enforcement of any ordinance or law that . . . [r]egulates the construction, use or repair, or requires the tearing down of any property." *Id.*

Deauville maintains that "[t]he period of time to comply with permitting requirements is not an *increased* period; it is just *the* period—subsumed in the 'reasonable speed and similar quality' language preceding the limitation provision at issue." Def. Resp. at 13. The Court disagrees. The Policy clearly distinguishes between business income losses resulting from time spent repairing the property "with reasonable speed and similar quality," on the one hand, and business income losses associated with "any increased period required" due to enforcement of laws and ordinances that regulate property construction and repairs, on the other. Classifying the City's permitting process under the former category is a forced and impractical construction of the policy language that ignores the role of permitting in enforcement of municipal code provisions. *See Land's End at Sunset Beach Cmty. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 745 F. App'x 314, 318 (11th Cir. 2018) ("The Florida Supreme Court has emphasized the necessity of interpreting the 'terms of an insurance policy . . . in their ordinary sense [to provide] a reasonable, practical and sensible interpretation consistent with the intent of the parties.'") (quoting *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 736 (Fla. 2002)).

Several courts interpreting similar policy provisions in other jurisdictions have reached this same conclusion. For example, in *Singh v. Amguard Ins. Co.*, No. CV160618PSGAJWX, 2017 WL 2423795, at *4 (C.D. Cal. Feb. 17, 2017), the court concluded that a "Period of Restoration" definition nearly identical to the one at issue here unambiguously excluded time spent obtaining permits from the city. The court reasoned that the "primary way in which [the city] regulates the 'repair' of real property in its jurisdiction is through building codes, which require land owners to submit engineering plans and calculations to [the city] for approval before issuing permits." *Id.* In *Brandywine Flowers, Inc. v. W. Am. Ins. Co.*, No. CIV. A. 92C-04-196, 1993 WL 133176, at *2 (Del. Super. Ct. Apr. 19, 1993), aff'd, 633 A.2d 368 (Del. 1993), another case with a virtually identical Period of Restoration definition, the court reached the same result. The court rejected "the notion that enforcement of a law must include affirmative action of some sort" and emphasized that "[i]mplementing building standards and withholding permits for construction in violation of those standards is how the city carries out the mandate or command of the municipal code provisions." *Id.* at *3; *see also Windowizards, Inc. v. Charter Oak Fire Ins. Co.*, No. CIV.A. 13-7444, 2015 WL 1400726, at *6 (E.D. Pa. Mar. 27, 2015) (concluding that "enforcement begins with the passing of relevant ordinances and *continues with either the granting or denial of a permit*, or the issuance of a violation.") (emphasis added).[4]

Although the Court agrees with Travelers that the Period of Restoration does not include time required to obtain permits from the City, the Court nevertheless finds that fact issues preclude summary judgment on Count V of Travelers' Complaint. To grant summary judgment for

---

[4] Indeed, documents in the record suggest that Deauville understood the permitting process to be a mechanism for the City to enforce its laws and ordinances. In a May 31, 2018 letter to Travelers, Deauville's representative states that "[t]he issuance of the permit by the City of Miami Beach is proof that Deauville had met any applicable law or ordinance by the city in order to do the work on the electrical vault needed to connect permanent power." *See* Pl. Mot., Ex. E [ECF No. 67-5].

Travelers on Count V, the Court would have to find that all repair work to property directly damaged by the electrical arcing incident was completed by December 20, 2017. However, as discussed above in connection with Count I, there are disputed issues of fact regarding whether the electrical arcing event caused damage to the transformer vault. The Court therefore cannot conclude at this stage that the Period of Restoration excludes the time period of Deauville's work on the transformer vault.

Accordingly, Travelers' motion for summary judgment on Count V is **DENIED**.

### ii. Coinsurance (Deauville's Motion for Partial Summary Judgment)[5]

Deauville seeks partial summary judgment regarding the interpretation and application of the Policy's Coinsurance Provision, which indicates that business interruption coverage under the Policy is subject to a "Coinsurance Percentage." *See* Policy at 31, Section E.1.m. The Coinsurance Percentage is calculated differently depending on whether the insured has reported "Business Income Estimated Annual Values." *Id.* Here, it is undisputed that Deauville did not report Business Income Estimated Values. Thus, the relevant calculation is as follows:

> (i) Divide the Limit of Insurance shown in the Declarations or elsewhere in this Coverage Part for the Business Income Coverage Extension by the "Business Income Actual Annual Value(s)" at the time of the "Breakdown" for all Covered Premises to determine the Coinsurance Percentage. The Coinsurance Percentage is subject to a maximum of 100%;
>
> (ii) Multiply the amount of the Business Income loss by the Coinsurance Percentage determined in paragraph m.(2)(b)(i) above;
>
> (iii) Subtract the applicable deductible from the amount determined in paragraph m.(2)(b)(ii) above;

---

[5] The coinsurance calculation is also at issue in Count V of Travelers' Complaint, but as discussed above, the Court finds that fact issues preclude summary judgment on that count. Therefore, a finding by the Court that Travelers appropriately interpreted the Coinsurance Provision still does not entitle Travelers to the declaratory judgment it seeks under Count V.

>   (iv)   We will pay the amount determined in m.(2)(b)(iii) above or the Limit of Insurance shown in the Declarations or elsewhere in this Coverage Part for Business Income Coverage Extension, whichever is less.

*See id.* Section E.1.m.(2)(b); Defendant's Mot. at 6.[6]

The parties' core disagreement on the Coinsurance Provision concerns how to properly determine the Business Income Actual Annual Value ("BIAAV"). The Policy defines the BIAAV as "the 'Business Income' values for the 12 months prior to the Breakdown." *See* Policy at 36, Section F.3. "Business Income" means the:

>   a.  Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
>
>   b.  Continuing normal operating expenses incurred, including "Ordinary Payroll."

*Id.* Section F.2. Based on these provisions, Travelers calculated the Coinsurance Percentage as follows. Travelers divided the limit of insurance for business income ($9,000,000) by $23,110,372—which Travelers determined to be the total of Deauville's Net Profit or Loss after income taxes plus the normal continuing operating expenses Deauville incurred during the 12 months prior to the Breakdown (*i.e.*, the period from July 1, 2016 to June 30, 2017).[7] *See* Pl. Resp. at 6. Travelers therefore calculated a Coinsurance Percentage of 38.94%—meaning the percentage of the business losses to be borne by Deauville would be just over 61%. *See id.*

---

[6] Under this formula, if the Business Income Actual Annual Value is higher relative to the Limit of Insurance, then the Coinsurance Percentage is lower (less than 100%), and Travelers pays less. If the Business Income Actual Annual Value is lower relative to the Limit of Insurance, then the Coinsurance Percentage is higher (up to a maximum of 100%), and Travelers pays more.

[7] Travelers excluded certain expenses incurred by Deauville in the 12 months prior to the Breakdown because they were the costs of goods sold or costs of sales, which Travelers does not consider "operating expenses." *See* Pl. Resp. at 6.

Deauville takes issue with two aspects of Travelers' calculation. **First**, Deauville argues that when calculating the BIAAV, Travelers should have included only normal operating expenses *that would be expected to continue during a business interruption*—not the normal operating expenses Deauville actually incurred during the 12 months prior to the Breakdown. *See* Def. Mot. at 13. Deauville thus asserts that the BIAAV is $10,590,164. *See* Def. SOMF ¶ 18. **Second**, Deauville contends that because the $9 million business interruption limit of insurance is based on an eight-month policy period, it should be prorated to an annual limit of $13.5 million for purposes of the coinsurance calculation, which uses a 12-month period to calculate the BIAAV used in the denominator. *See id.* at 15-17. If a $13.5 million limit is used as the numerator in the coinsurance calculation, and Deauville's BIAAV figure of $10,590,164 is used as the denominator, then Deauville would not be considered underinsured and no coinsurance penalty would apply. *See id.* at 17; Def. SOMF ¶¶ 17-22.

However, the plain language of the Policy does not support Deauville's interpretation of the Coinsurance Provision. The Policy indicates that the BIAAV is determined by using the Business Income values "for the 12 months prior to the Breakdown"—meaning that the calculation must use the "continuing normal operating expenses" incurred in that period. *See* Policy at 36, Section F.3. The Policy does not specifically define "continuing normal operating expenses." However, a term is not rendered ambiguous simply because it is undefined. *Penzer v. Transportation Ins. Co.*, 545 F.3d 1303, 1306 (11th Cir. 2008) (citing *Swire Pac. Holdings,* 845 So. 2d at 165). Rather, as stated above, a policy is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.* Unless a term is ambiguous, it will be given its plain meaning, which courts often ascertain by consulting legal and non-legal dictionaries. *See Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1221 (11th Cir. 2015).

Deauville posits that the term "continuing" in "continuing normal operating expenses" signifies that the expenses that should be considered when determining the BIAAV are those that *would be expected* to continue during a *post-loss* period of business interruption, rather than those normal operating expenses that were incurred continuously during the 12-month *pre-loss* period. *See* Def. Mot. at 12.  The Court disagrees.  Neither the definition of BIAAV nor the formula for calculating Business Income provide for consideration of the parties' *expectations* concerning post-loss operating expenses—and the Court cannot read language into the Policy that does not exist.  *See Reuter v. Lancet Indem. Risk Retention Grp., Inc.*, 262 F. Supp. 3d 1341, 1349 (S.D. Fla. 2017).  Rather, the Policy unambiguously indicates that the BIAAV is determined based on the normal operating expenses that were continuing—*i.e.*, ongoing, constant, or uninterrupted—*during the 12 months prior to the loss*.  *See* Continuing, *Black's Law Dictionary* (11th ed. 2019) (defining "continuing" as "uninterrupted; persisting" or "not requiring renewal; enduring").

The Court further disagrees with Deauville's contention that this interpretation gives "continuing normal operating expenses" one meaning in the context of BIAAV and a different one in the context of determining Deauville's insured loss.  In both contexts, the phrase has the same meaning—the expenses are simply evaluated for a different time period, which is precisely what the Policy specifies.  *Compare* Policy Section A.2.a.(1) (indicating that Travelers will cover "actual loss of 'Business Income' from a total or partial interruption of business *during the 'Period of Restoration'* . . . " ) with Section F.3 (indicating that BIAAV is determined based on "'Business Income' values *for the 12 months prior to the 'Breakdown'*.") (emphasis added).

There is also no support in the Policy for Deauville's position that the "limit of insurance" should be prorated to an annual limit of $13.5 million for purposes of the coinsurance calculation. The Policy's formula for determining the coinsurance percentage expressly states that the

numerator is "the Limit of Insurance shown in the Declarations . . . for the Business Income Coverage Extension." *See* Policy at 32, Section E.1.m.(2)(b). The Limit of Insurance listed in the Declarations for the Business Income Coverage Extension is $9,000,000. *See id.* at 10. It is not the Court's job to rewrite the policy to rectify what Deauville perceives to be an unsound mathematical formula—particularly considering that Deauville's premium was based on the parties' agreed-upon terms.

Accordingly, Deauville's Motion for Partial Summary Judgement—which seeks partial summary judgment on Deauville's Counterclaim and summary judgment on Travelers' Eighth Affirmative Defense—is **DENIED**.

## CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Plaintiff's Motion for Summary Judgment [ECF No. 67] is **GRANTED** with respect to Count IV and **DENIED** with respect to Counts I and V, and Defendant's Motion for Partial Summary [ECF No. 64] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 21st day of January, 2021.

_____
**RODOLFO A. RUIZ II
UNITED STATES DISTRICT JUDGE**